1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10  STACY M. MORAN,                   )  No. CV 05-131-PJW
                                      )
11                  Plaintiff,        )
                                      )
12              v.                    )  MEMORANDUM OPINION AND ORDER
                                      )
13  JO ANNE B. BARNHART, Commissioner )
    of the Social Security            )
14  Administration,                   )
                                      )
15                  Defendant.        )
    _____ )

16

17                                I.

18                            INTRODUCTION

19       Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and

20  1383(c)(3), seeking reversal of the decision by Defendant Social

21  Security Administration ("Agency") denying Supplemental Security

22  Income ("SSI") and Disability Insurance Benefits ("DIB").

23  Alternatively, she asks the Court to remand the case to the Agency for

24  further proceedings.  For the reasons discussed below, the decision of

25  the Agency is REVERSED and the case is REMANDED for further

26  proceedings.

27

28

II.

BACKGROUND

Plaintiff was born on October 28, 1970, and was 33 years-old at the time of the administrative hearing. (AR 39, 70.) She has a high school education plus one year of college, and has past relevant work experience as a medical biller and billing collections clerk. (AR 84, 89.)

Plaintiff filed protectively for SSI and DIB on August 8, 2002. (AR 70-72.) In her application, she alleged disability since July 11, 2001, because of multiple sclerosis ("MS"), osteoarthritis of the lower back, hypothyroidism, a vision impairment, and fatigue. (*See* AR 59, 70.) She timely requested a hearing before an administrative law judge ("ALJ") after her claim was denied initially and on reconsideration. (*See* AR 59-69.)

The ALJ held a hearing on December 11, 2003. (AR 36.) Plaintiff appeared with counsel and testified. (AR 38-54.) Plaintiff testified that she is married and rents a home in Orange County with her husband, who is employed as a truck driver. (AR 39-40, 42.) She told the ALJ that she had been "recently" laid off from her last job, which was in payroll accounting. (AR 41.) Although Plaintiff admitted that state disability provides her health insurance, she disavowed any intention of applying for unemployment benefits. (AR 42.)

When asked whether she could work, Plaintiff stated that she was "not sure." (AR 43.) She explained that she could not stand or sit for protracted periods of time because of back pain; she claimed to spend the day in bed when her back pain became too acute. (AR 43-44.) She considered her back pain to be one of her most bothersome symptoms. (AR 46.) Plaintiff attested to attention and concentration

2

deficits which left her feeling "overwhelmed" in the face of distractions at work. (AR 43-44.) Additionally, she claimed to experience bouts of vertigo once or twice a month for "a couple of hours" at a time, numbness in her hands that would cause her to drop objects "all day long," headaches that she treated with Tylenol and sleep, and blurred vision "almost every day." (AR 48-50.) Plaintiff testified that she only slept four hours per night because of muscle spasms in her back and arms, and stated that she needed to lie down during the day--where she would remain for "most of the day"--three or four days per week because of fatigue. (AR 50-51.) She also told the ALJ that she was intolerant of sunlight, and that heat brought on chronic diarrhea with incontinence. (AR 53.)

Plaintiff told the ALJ that she was 5'1" tall and 270 pounds, and added that she had "gained about 30 pounds in the last couple months." (*See* AR 40.) She explained that, when she was working full-time before the alleged onset date, her normal weight was 250 pounds. (AR 54.) She stated that her husband did most of the chores around the house and claimed to help him "[v]ery rarely," although she admitted that she accompanied him grocery shopping and conceded that she "sometimes" did the cooking. (AR 44, 46.) Despite these limitations, however, Plaintiff stated that she owns and drives her own car, and denied that any doctor had ever told her not to drive. (AR 40-41, 43.) Additionally, she estimated that she could stand for up to two hours at a time, and could sit for an hour. (AR 51-52.) Plaintiff testified that she attends church services twice weekly, and said that she sometimes visits her mother, who "lives right around the corner." (AR 44, 47.) She explained that, otherwise, she lies in bed and sleeps or watches television. (AR 51.)

1      Finally, Plaintiff testified about her medical treatment.  Per

2  her doctor's advice, Plaintiff used a cane, although she admitted that

3  she could walk without one.  (AR 48.)  She stated that she had last

4  seen her neurologist approximately six months earlier, but testified

5  that she had an upcoming appointment with him in two months.  (AR 45-

6  46.)  Plaintiff added that she was taking medication and conceded that

7  her medication alleviated her symptoms "sometimes."  (AR 46.)  She

8  testified that her medicines for MS prevented her symptoms from

9  getting worse, but she added that the medicines her doctor had

10 prescribed had side-effects of flu-like symptoms, muscle weakness, and

11 weight gain.  (AR 46, 52.)  Plaintiff conceded that her doctors had

12 advised her to lose weight, and claimed to be on a Weight Watchers

13 program.  (AR 46.)  She denied being on any medication for diarrhea,

14 although she claimed that one of her doctors had "recommended a bowel

15 program."  (AR 53-54.)

16      Although no vocational expert appeared at the hearing, the ALJ

17 told Plaintiff's counsel that he would pose a hypothetical question to

18 the vocational expert via interrogatories; the question would contain

19 all of the limitations set forth by Plaintiff's treating neurologist,

20 Dr. Daniel Giang.  (*See* AR 54; *see also* AR 340-46.)  Counsel agreed,

21 the ALJ adjourned the hearing.  (AR 55-56.)

22      On January 29, 2004, the ALJ posed a battery of hypothetical

23 questions to Karen Winn-Boaitey, the vocational expert; she opined

24 that the hypothetical person described in those interrogatories could

25 not perform Plaintiff's prior job, but could perform other light work.

26 (*See* AR 386-89.)  On February 4, 2004, counsel for Plaintiff submitted

27 interrogatories of his or her own to Ms. Winn-Boaitey; in response to

28 those questions--which differed from those posed by the ALJ primarily

1   in that they posited a person who would be unable to concentrate for

2   up to two-thirds of the workday and who would be absent from work one

3   day per month--the expert opined that the hypothetical person

4   described by Plaintiff's counsel could not perform any work.  (*See* AR

5   390-93.)

6       On August 23, 2004, after analyzing Plaintiff's claims under the

7   Agency's five-step sequential evaluation process, the ALJ issued a

8   decision denying her DIB and SSI claims.  (AR 18-27.)  At step one,

9   the ALJ found that, although Plaintiff had performed some hourly work

10  for one month since her alleged onset date, that activity was "not

11  [...] indicative of substantial gainful activity."  (AR 19-20.)

12  Accordingly, the ALJ reached the next step.

13      At step two, the ALJ found that Plaintiff suffered from MS, optic

14  neuritis, hypothyroidism, knee and back pain, scoliosis, carpel tunnel

15  syndrome, obesity, and mild obstructive sleep hypopnea, all "severe"

16  impairments within the meaning of the regulations.  (*See* AR 21.)  At

17  step three, however, the ALJ determined that these impairments were

18  not sufficiently severe to meet or equal a Listing.  (*See* AR 21.)

19      Thus, the ALJ considered Plaintiff's residual functional

20  capacity.  After evaluating the medical evidence, the ALJ found that

21  Plaintiff retained "the residual functional capacity as set forth by

22  her treating physician, Dr. Giang."  (AR 23.)  Based on her

23  understanding of Dr. Giang's assessment of Plaintiff's functional

24  capacity,[1] the ALJ made the step-four determination that she could not

25

26          [1]  Because the ALJ's understanding of Dr. Giang's residual

27  functional capacity assessment is at the heart of one of Plaintiff's
    substantive challenges to the decision, the ALJ's summary of Dr.

28  Giang's opinion will be set forth in full below.

1    return to her prior work, relying on the vocational expert's responses

2    to the interrogatories that the ALJ had propounded to her on January

3    29, 2004, for this conclusion.  (AR 24 (citing AR 386-89).)

4          At step five, however, the ALJ--again relying on Ms. Winn-

5    Boaitey's responses to his interrogatories--found that Plaintiff

6    retained the residual functional capacity for a range of light work,

7    and identified some jobs available in the local economy.  (*See* AR 25.)

8    Accordingly, the ALJ concluded that Plaintiff was not disabled as

9    defined in the Social Security Act (the "Act") at any time through the

10   date of the decision.  (AR 26-27.)

11         Plaintiff appealed the ALJ's decision to the Appeals Council.

12   (AR 13.)  The Appeals Council denied review, however, and the decision

13   of the ALJ became the final decision of the Agency.  (AR 7-10.)

14   Plaintiff then filed her Complaint in this Court; the parties filed a

15   Joint Stipulation ("Joint Stip.") on September 7, 2005.

16                                 III.

17                         STANDARD OF REVIEW

18         "Disability" under the applicable statute is defined as the

19   inability to perform any substantial gainful activity because of "any

20   medically determinable physical or mental impairment which can be

21   expected to result in death or which has lasted or can be expected to

22   last for a continuous period of not less than twelve months."  42

23   U.S.C. § 1382c(a)(3)(A).  The Court may overturn an ALJ's decision

24   that a claimant is not disabled only if the decision is not supported

25   by substantial evidence or is based on legal error.  *See Magallanes v.*

26   *Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

27         Substantial evidence "'means such relevant evidence as a

28   reasonable mind might accept as adequate to support a conclusion.'"

                                  6

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).)  It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

"The Court must uphold the ALJ's conclusion even if the evidence in the record is susceptible to more than one rational interpretation." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).  Indeed, if the record evidence can reasonably support either affirming or reversing the Agency's decision, this Court must not substitute its judgment for that of the ALJ.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the ALJ committed error but the error was harmless, reversal is not required. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2003)(applying the harmless error standard).

IV.

DISCUSSION

Plaintiff argues that the hypothetical question the ALJ posed to the vocational expert did not accurately set forth Plaintiff's limitations and, thus, did not supply substantial evidence for the ALJ's finding of non-disability at step five. (*See* Joint Stip. at 3-6.)  In addition, Plaintiff contends that the ALJ improperly rejected the opinion of the family practitioner who treated her and also rejected that of the neuropsychologist who examined her in favor of the opinion offered by her treating neurologist. (*See* Joint Stip. at 10-13.)

The Court will address both of Plaintiff's contentions, albeit in reverse of the order in which she has briefed them.  As will be

7

1  explained below, however, the Court concludes that material error

2  requires the matter to be remanded to the ALJ for further proceedings.

3  A.   The Medical Evidence

4       Because each of Plaintiff's claims implicates the ALJ's handling

5  of the medical evidence, the Court will summarize the pertinent

6  portions of the medical record, along with the ALJ's interpretation of

7  that evidence in his decision.  As will become evident, some of the

8  conclusions that the ALJ drew from the medical record are unsupported

9  by substantial evidence, and this error infected his analysis at step

10  five.

11       1.   The Opinion Of Dr. Rohinder Sandhu, M.D. (The Treating

12            Family Practitioner)

13       On January 27, 2003, Dr. Rohinder Sandhu, M.D., the family

14  practitioner who treated Plaintiff, completed a check-the-box

15  "Multiple Sclerosis Impairment Questionnaire" ("MS Questionnaire")

16  given to him by Plaintiff's counsel.  (See AR 265-71.)  Dr. Sandhu

17  confirmed diagnoses of MS and "recurrent loss of vision secondary to

18  MS," as well as "hypothyroid, knee pain, back pain, depression, [and]

19  joint pain."  (See AR 265.)  The doctor also checked boxes indicating

20  that she suffers from fatigue, balance problems, and unstable walking,

21  with weakness in her knees and hands, numbness of the hands, feet,

22  face, and legs, and increased muscle tension in her back.  (See AR

23  265-66.)  Dr. Sandhu also noted that Plaintiff suffered from bowel

24  problems, double or blurred vision, eye pain, involuntary rapid eye

25  movement, headaches, and sensitivity to heat.  (AR 266.)  He described

26  Plaintiff's back pain as "severe" and "constant."  (AR 266-67.)  He

27  checked a box indicating that Plaintiff was "incapable of even 'low

28

8

1  stress,'" and circled the word "frequently" to describe her experience

2  of "pain, fatigue, or other symptoms severe enough to interfere with

3  attention and concentration." (AR 268.)

4      After summarizing Plaintiff's physical and cognitive impairments,

5  Dr. Sandhu opined that she retained the residual functional capacity

6  to sit for three hours (provided she could get up and move around

7  every one to one-and-a-half hours for about ten minutes at a time),

8  stand or walk for one hour, lift or carry no more than five pounds in

9  any circumstance, and could never kneel, bend, or stoop; he also

10 advised that any job she took would have to account for her limited

11 vision and her need to avoid temperature extremes and fumes, and

12 pushing. (*See* AR 269-71.) This doctor also checked a box affirming

13 that the side-effects caused by Plaintiff's prescribed medications

14 were severe enough to interfere with her ability to work an eight-hour

15 day, but did not explain. (AR 344.) Finally, Dr. Sandhu estimated

16 that Plaintiff's symptoms would require her to miss more than three

17 days of work per month. (AR 270.)

18     After reviewing Dr. Sandhu's treatment notes, (*see* AR 20), the

19 ALJ discounted his assessment of Plaintiff's limitations. The ALJ's

20 discussion of her rationale for so doing is worth repeating:

21         Such limited functional capacities are inconsistent with the

22         record as a whole, including [Plaintiff's] daily activities

23         of living. An overview of Dr. Sandhu's records reflected

24         periodic treatment for general medical care and for multiple

25         complaints, including sore throats, congestion, coughing,

26         back and joint pain, with primary treatment consisting of

27         medications with no indications of adverse side effects.

28         Dr. Sandhu's statements with respect to [Plaintiff's]

9

1    restrictions are seemingly inconsistent with his treatment

2    recommendations that [she] continue to exercise and [her]

3    acknowledged symptomatic improvement following physical

4    therapy.  While Dr. Sandhu, an internist, has placed

5    significant limitations on [Plaintiff's] functioning, Dr.

6    Giang, a neurologist who has treated [her] over a period of

7    time specifically in relation to her multiple sclerosis, is

8    felt to be better professionally qualified to comment on

9    [her] functional capacities [ . . . .]

10   (AR 23 (citations to record omitted).)   For these reasons, the ALJ

11   concluded that the opinion of Dr. Giang would be "given the greater

12   weight."   (AR 23.)

13        2.    The Opinion Of Dr. Craig Muir, M.D. (The Examining

14              Neuropsychologist)

15        As the foregoing summary of Dr. Sandhu's opinion reflects, he

16   did not opine as to the severity of Plaintiff's cognitive limitations.

17   (*See* AR 265-71.)   Accordingly, Dr. Craig Muir, Ph.D., a

18   neuropsychologist, examined Plaintiff and administered a battery of

19   tests over a several-day period from September 24 to November 4, 2003.

20   (*See* AR 359-61.)   These tests included the Wechsler Adult Intelligence

21   Scale III ("WAIS-III"), the Wechsler Memory Scale III (WMS), Consonant

22   Trigrams, the Stroop word, color, and color-word tests, and a Word

23   Fluency test, as well as a series of clinical interviews.   (*See* AR

24   360.)

25        Although Plaintiff's scores were in the average to high-average

26   range on some tests, Dr. Muir concluded that Plaintiff's concentration

27   was "impaired."   (AR 360-61.)   He explained:

28

10

1    [Plaintiff] had her most severe deficits on attention-
2    concentration tasks such as Auditory Consonant Trigrams, in
3    which she scored in the Impaired Range.  These are the types
4    of tasks which best represent a real-life work situation, in
5    which information is presented with distracting stimuli in
6    the environment and she is sometimes asked to switch from
7    one task to another and then back again.  Memory and
8    processing speed also play a part in the work environment.
9    Thus, though her verbal intellectual skills are high, she is
10   unable to bring them to bear in a real-life work situation.
11   (AR 361.)  This examining physician concluded: "These test results fit
12   with her reported experiences at work and make her unemployable."  (AR
13   361.)

14   The ALJ noted Dr. Muir's ultimate conclusion.  (AR 23.)  She then
15   explained why, in her view, that conclusion did not enjoy the support
16   of substantial evidence:

17   [Plaintiff] was able to provide a clear history of her
18   personal and medical background, and Dr. Muir indicated test
19   scores measuring memory were mostly in the range of average.
20   She was able to sustain attention to complete psychological
21   tests.  Additionally, a statement submitted by [Plaintiff's]
22   employer [. . .] reflected that while at times [she] did not
23   remember to do some tasks asked of her, her duties involved
24   preparing bank deposits and payroll and opening the cash
25   registers for the day.  Such activities suggest the ability
26   to focus attention and concentration.  Elsewhere in the
27   record, [Plaintiff's] treating sources had noted the absence
28   of any loss of cognitive ability and had indicated no

11

1       problems with memory or attention.  Further, the conclusion

2       of Dr. Muir exceeds [Plaintiff's] acknowledged activities

3       and her statements of record which characterize

4       concentration as an occasional problem.

5  (AR 23 (citations to record omitted).)  For these reasons, the ALJ

6  "d[id] not accept [Dr. Muir's] conclusion."  (AR 23.)

7       3.   The Opinion Of Dr. Daniel Giang, M.D. (The Treating

8           Neurologist)

9       In a letter dated November 13, 2003, Dr. Daniel Giang, M.D.--the

10  neurologist who treated Plaintiff for more than two-and-a-half years--

11  summarized her physical symptoms in narrative form:

12       Over the course of treatment [Plaintiff's] symptoms have

13       included eye pain and visual blurring, fatigue, temperature

14       intolerance, muscle cramps, headaches, dizziness, memory

15       difficulties, poor coordination, weakness/heaviness

16       especially with stair climbing and carrying objects,

17       intermittent "jumping eyes," visual blurring after one hour

18       of computer work, imbalance (using a cane at times to assist

19       her balance), alternating diarrhea (with intense urgency)

20       and constipation, and intermittent vertigo.

21  (AR 347.)  As to Plaintiff's cognitive difficulties, Dr. Giang appears

22  to have deferred to Dr. Muir:

23       Of particular concern [. . .] are [Plaintiff's] complaints

24       of memory loss and concentration difficulties.  These

25       symptoms are known to be demonstrated by people with

26       multiple sclerosis, and can be mild to severe.  Because of

27       these concerns, she was referred to Craig Muir, Ph.D. in

28       neuropsychology, for evaluation.  In a discussion with Dr.

12

1      Muir regarding a preliminary report, he advised that her

2      attention and concentration were significantly decreased

3      such that she should not continue working.

4 (AR 348.)   Dr. Giang underscored his deference to Dr. Muir's opinions

5 about Plaintiff's cognitive limitations, explaining: "[F]or questions

6 regarding cognitive function, please contact Craig Muir in the

7 psychology department."   (AR 348.)

8     Five days later, on November 18, 2003, Dr. Giang distilled this

9 summary into an MS Questionnaire provided by Plaintiff's counsel.

10 (*See* AR 340-46.)   After confirming his diagnosis of MS and noting that

11 Plaintiff's prognosis was "poor," Dr. Giang checked boxes indicating

12 that she suffers from fatigue, balance problems (including vertigo),

13 unstable walking, poor coordination, intermittent weakness in her

14 legs, numbness, increased muscle tension, thermal sensitivity, double

15 or blurred vision, and bowel problems (including diarrhea).   (*See* AR

16 340-42.)   He noted that he did not believe Plaintiff was malingering,

17 and opined that her symptoms were subject to exacerbation and

18 remission, particularly by stress.   (AR 343-44.)   Dr. Giang also

19 checked boxes indicating that Plaintiff suffered from "difficulty

20 remembering," "problems with attention," and "difficulty solving

21 problems," and circled the word "frequently" to describe her

22 experience of "pain, fatigue, or other symptoms severe enough to

23 interfere with attention and concentration"; as evidence for each of

24 these notations, Dr. Giang cited Plaintiff's subjective symptom

25 complaints and Dr. Muir's testing.   (*See* AR 341, 343-44.)

26     Unlike Dr. Sandhu or Dr. Muir, however, Dr. Giang did not opine

27 that Plaintiff could not work.   Instead, after summarizing Plaintiff's

28 physical and cognitive impairments, Dr. Giang opined that she had the

residual functional capacity to sit for 8 hours (provided that she
could get up and walk around every hour for approximately 5 minutes),
stand or walk for 4 hours, lift up to 50 pounds frequently, and more
than 50 pounds occasionally, carry up to 20 pounds frequently, and 50
pounds on occasion, and would need to avoid temperature extremes,
humidity, and heights. (*See* AR 344-46.) This doctor also noted that,
although Plaintiff's pharmacological regimen could cause medicinal
side-effects, such side-effects would not interfere with her ability
to work an eight-hour day. (AR 344.) Like Dr. Sandhu, Dr. Giang
cautioned that Plaintiff's symptoms would produce "good days" and "bad
days"; in Dr. Giang's view, however, her impairments would require her
to miss only one day per month. (AR 345-46.) The ALJ accepted Dr.
Giang's opinion without qualification. (*See* AR 23-24.)

B.   The ALJ Properly Rejected Dr. Sandhu's Assessment Of Plaintiff's
     Limitations, But Erred In Rejecting Dr. Muir's Opinion

     In light of the foregoing summary of the evidence, it is clear
that the ALJ committed material legal error in some of the ways
asserted by Plaintiff. For that basic reason, and as explained in
greater detail below, the decision cannot stand, and additional
administrative proceedings are required.

     1.   The ALJ's Rejection Of Dr. Sandhu's Opinion Was Supported by
          Specific And Legitimate Reasons

     Plaintiff criticizes the "two rationales" the ALJ offered for
rejecting Dr. Sandhu's assessment of her functional limitations, and
argues that Dr. Sandhu's opinion must be re-assessed on remand. (*See*
Joint Stip. at 10-13.) The Court disagrees.

     The ALJ must offer specific and legitimate reasons to reject the
opinions of treating physicians. *See Holohan v. Massanari*, 246 F.3d

14

1195, 1202-03 (9th Cir. 2001); *see also Lester v. Chater*, 81 F.3d 821,
830 (9th Cir. 1996).  Although a treating physician's opinion is
generally afforded the greatest weight in disability cases, "it is not
binding on an ALJ with respect to the existence of an impairment or
the ultimate determination of disability." *Tonapetyan v. Halter*, 242
F.3d 1144, 1149 (9th Cir. 2001).  As long as "there is evidence
sufficient to support either outcome, we must affirm the decision
actually made." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

When there are conflicting medical assessments by two physicians
whose opinions are entitled to equal weight, it is within the ALJ's
discretion to resolve the conflict.  *See Thomas v. Barnhart*, 278 F.3d
947, 956-57 (9th Cir. 2002).  This means that "[t]he ALJ is entitled
to resolve any evidentiary conflict between medical opinions of equal
weight, such as two treating physicians." *Watson v. Barnhart*, No.
03-0552-SC, 2003 WL 21838474, at *2 (N.D. Cal. Aug. 1, 2003)(citation
omitted).  This is part and parcel of the principle that, when
presented with conflicting medical opinions, the ALJ must determine
credibility and resolve the conflict.  *See Matney v. Sullivan*, 981
F.2d 1016, 1019 (9th Cir. 1992); *see also Benton ex rel. Benton v.
Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003)("Where [...] the record
contains conflicting medical evidence, the ALJ is charged with [...]
resolving the conflict.").  In the case of a conflict, however, "the
ALJ must give specific, legitimate reasons for disregarding the
opinion of the treating physician." *Matney*, 981 F.2d at 1019.

Here, Plaintiff argues that, without mentioning any of the other
factors, the ALJ rejected Dr. Sandhu's assessment of Plaintiff's
functional capacity on the grounds that it was inconsistent with Dr.
Sandhu's treatment recommendations and because Dr. Giang was better

15

1  qualified to comment on Plaintiff's limitations.  (*See* Joint Stip. at

2  10-11.)  As Plaintiff points out, the regulations specifically provide

3  that, when a specialist renders an opinion within his specialty that

4  disagrees with the opinion of a generalist, the ALJ may give greater

5  weight to the specialist's opinion.  (*See* Joint Stip. at 11 (citing 20

6  C.F.R. §§ 404.1527(d), 416.927(d)).)  As the record reflects, Dr.

7  Giang is a neurologist, whereas Dr. Sandhu's specialty is

8  pulmonary/internal medicine.  (*See* AR 271, 346.)  Given that MS is a

9  neurological disorder, *see Lowe v. Angelo's Italian Foods, Inc.*, 87

10 F.3d 1170, 1174 (10th Cir. 1996)(describing multiple sclerosis as

11 "neurological disease for which there is no known cure"), the ALJ

12 legitimately could favor Dr. Giang's assessment of Plaintiff's

13 limitations over that offered by Dr. Sandhu.

14      Additionally, the ALJ mentioned a *third* consideration, and one

15 which the Court finds sufficiently specific and legitimate all by

16 itself to justify rejecting Dr. Sandhu's opinion entirely:

17 specifically, the ALJ rejected Dr. Sandhu's opinion primarily because

18 it was "inconsistent with the record as a whole, including

19 [Plaintiff's] daily activities of living."  (AR 23.)  Plaintiff

20 overlooks this consideration, (*see* Joint Stip. at 10-11), which is, in

21 turn, inextricably intertwined with the ALJ's finding that Plaintiff's

22 testimony was not entirely credible.  What the ALJ had to say about

23 her credibility bears repeating:

24      While [Plaintiff] has medically determinable impairments

25      which could be expected to produce some symptomatology, the

26      allegations as to the extent, intensity, duration, and

27      resulting functional limitations and restrictions cannot be

28      found persuasive or consistent with the record as a whole.

16

Clinical records note that the disease-modulating therapy of Avonex for treatment of [MS] has been well tolerated. An overview of the record reflects no changes in this medication reflective of uncontrolled symptoms. While [Plaintiff] has testified as to having flu symptoms associated with medications, her physician reports that she experiences no side effects severe enough to interfere with employment. Further, the record fails to show [Plaintiff] has required other forms of significant treatment such as periods of hospital confinement or emergency room treatment for exacerbations of her conditions or debilitating symptoms. The undersigned has considered the descriptions of [Plaintiff's] functional limitations as indicated at the hearing and other statements of record. However, a clinical notation under date of June 16, 2003 recorded [Plaintiff's] statements that she was working part-time and that her energy level was okay. In addition, in terms of her daily activities, it has been reported that she is able to perform a wide range of household chores such as preparing meals, general light cleaning and laundry. [Plaintiff] is able to attend to self care such as dressing and bathing. She retains the ability to drive, read, shop, attend church and Bible studies, participate in children's ministry and visit her relatives. Her hobbies reportedly include crafts and singing. She bathes her cat.

17

1  (AR 22 (citations to record omitted).)  "In all," the ALJ found that
2  Plaintiff's "activities negate the allegations of disabling pain,
3  fatigue, and other symptomatology prohibiting the performance of all
4  work activity."  (AR 22.)

5       Inconsistency between a treating physician's assessment of a
6  claimant's limitations and the claimant's daily activities is a
7  specific, legitimate reason to reject the treating physician's
8  opinion.  *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).
9  Mindful that "[c]redibility determinations are the province of the
10 ALJ," *see Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989), this Court
11 will not second-guess an unchallenged credibility finding.  *See*
12 *Solomon v. Secretary of Health and Human Services*, No. 91-CV-77171 DT,
13 1992 WL 478586, at *2 (E.D. Mich. Aug. 13, 1992)("The Plaintiff has
14 not challenged the ALJ's determination of her credibility, and the
15 Court accepts it as accurate.").  Because Plaintiff has not challenged
16 the ALJ's adverse credibility determination, (*see generally* Joint
17 Stip.), and because Dr. Sandhu's opinions evidently were based on
18 Plaintiff's subjective symptom complaints, her failure to dispute the
19 credibility assessment means that she cannot "show that the ALJ erred
20 in her decision not to credit [the treating physician's] assessment,
21 which was based in large part on [plaintiff's] statements."  *See*
22 *Siska v. Barnhart*, No. C 00-4788 MMC, 2002 WL 31750220, at *3 (N.D.
23 Cal. Dec. 4, 2002).

24      In sum, the ALJ's observation that Dr. Sandhu's assessment of
25 Plaintiff's limitations was inconsistent with the medical record "as a
26 whole" as well as the record of her daily activities was supported by
27
28

                                    18

the evidence.[2]   Thus, the ALJ's reasoning was sufficiently specific
and legitimate to justify rejecting that opinion.  *See Rollins*, 261
F.3d at 856.  Plaintiff does not challenge the ALJ's reliance on this
inconsistency; indeed, she does not even challenge the ALJ's finding
that her subjective symptom complaints were not entirely credible.
Accordingly, the Court concludes that the ALJ's rejection of Dr.
Sandhu's functional capacity assessment was not reversible error.  *See*
*Batson*, 359 F.3d at 1195 (holding that the ALJ properly rejected a
treating physician's opinion that was "in the form of a checklist, did
not have supportive objective evidence, was contradicted by other
statements and assessments of [the claimant's] medical condition, and
was based on [the claimant's] subjective descriptions" of his
symptoms).

    2.   The ALJ's Rejection Of Dr. Muir's Opinion Was Not Supported
       By Specific, Legitimate Reasons

    Plaintiff also maintains that the ALJ erred in rejecting the
opinion offered by Dr. Craig A. Muir, Ph.D., the neuropsychologist who
administered a battery of cognitive tests to her from September to
November, 2003.  (*See* Joint Stip. at 11-13.)   The Court's review of
the record confirms that Plaintiff is correct.

    In quantifying the weight that an ALJ should give to a particular
medical opinion, the Ninth Circuit distinguishes between the opinions
of treating physicians, examining physicians, and non-examining

--------

    [2]   Dr. Sandhu's assessment of Plaintiff's limitations was much
more dire than the assessment Dr. Giang reached nearly a year later.
(*Compare* AR 269-71 *with* 344-46.)   The ALJ's account of Plaintiff's
daily activities (*see* AR 22) tracked Plaintiff's own report of her
daily activities, which was generally consistent with that offered by
her husband.  (*See* AR 104-15.)

1  physicians.  *See Lester*, 81 F.3d at 830.  Generally, an ALJ should

2  give greatest weight to a treating physician's opinion and more weight

3  to the opinion of an examining physician than to one of a

4  non-examining physician.  *See Andrews v. Shalala*, 53 F.3d 1035, 1040-

5  41 (9th Cir. 1995); *see also* 20 C.F.R. § 416.927(d)(1),(2).  An ALJ

6  must provide clear and convincing reasons rejecting the uncontradicted

7  opinion of an examining physician.  *See Lester*, 81 F.3d at 830.  Even

8  if an examining physician's opinion is contradicted, an ALJ must

9  articulate specific, legitimate reasons for rejecting it.  *See id.* at

10  830-31; *see also Nguyen v. Chater*, 100 F.3d 1462, 1466 (9th Cir.

11  1996).

12      As noted above, and after administering an array of cognitive

13  tests, Dr. Muir concluded that Plaintiff's attention and concentration

14  deficits "ma[d]e her unemployable." (AR 361.)  The ALJ did "not

15  accept this conclusion" because: (1) it was inconsistent with the fact

16  that Plaintiff was able to relate her medical background and complete

17  the tests;[3] (2) it did not account for the fact that Plaintiff's

18

19  _____

20      [3]  The Court finds that this reason is not sufficiently specific
   and legitimate to withstand scrutiny.  The fact that Plaintiff "was
   able to sustain attention to complete psychological tests" (AR 23)
21  begs the question.  Aside from the fact that the tests were given
   during five days over a two-month period, (*see* AR 359), Dr. Muir
22  evidently did not consider Plaintiff's ability to complete the tests a
   valid indicator of her concentration in the workplace, and explained
23  why not. (*See* AR 361.)  In these circumstances, the ALJ's
   contrariwise conclusion amounted to an improper usurpation of Dr.
24  Muir's role.  *See Nelsen v. Barnhart*, No. C 00-2986 MMC, 2003 WL
   297738, at *4 (N.D. Cal. Feb. 4, 2003)(faulting the ALJ for
25  "substitut[ing] his own view of the effects of a mental impairment on
   a claimant for that of an examining psychologist" where the ALJ had
26  cited the fact that a claimant was "able to complete psychological
   testing" as evidence refuting the examining psychologist's conclusion
27  that she suffered disabling concentration deficits).

28

1   previous job "suggests the ability to focus attention and

2   concentration";[4] (3) some of Plaintiff's treating physicians did not

3   note any attention or concentration deficits;[5] and (4) Plaintiff's

4   testimony and activities showed concentration deficits to be only an

5   "occasional problem."[6]  (*See* AR 23.)  As the above-footnoted comments

6

7   _____

8       [4]  The only evidence that the ALJ cited for her conclusion that
9   Plaintiff's previous job required concentration is a letter submitted
    by her former employer.  (*See* AR 23 (citing AR 136).)  That letter
10  reported that Plaintiff worked a part time job in which her employer
    "made exceptions for her that I would not have made for other
11  employees," including permitting Plaintiff to leave any time she felt
    unwell; even with that accommodation, however, her employer reported
12  that Plaintiff "has had times when she does not remember to do some of
    the tasks I have asked of her."  (AR 136.)  This documentation of
13  Plaintiff's imperfect ability to sustain sufficient concentration to
14  perform even a part-time job with major accommodations is not
    especially probative of the question whether Plaintiff is capable of
15  *sustained* concentration on a full-time basis.

16      [5]  The ALJ's reliance upon the fact that some of Plaintiff's
17  treating physicians "had indicated no problems with memory or
    attention" (*see* AR 23) is misleading.  The opinions the ALJ cited for
18  this proposition all pre-dated the objective tests given by Dr. Muir
    beginning in September 2003: the only objective testing that was *ever*
19  done.  (*See* AR 23 (citing AR 233-35 and 265-71--treating physicians'
    assessments from September 2002 and January 2003, respectively--in
20  support of his rejection of Dr. Muir's conclusions).)

21      [6]  The ALJ cited Plaintiff's and her husband's comments about
22  Plaintiff's limitations in her Daily Activities Questionnaire for the
    proposition that her concentration deficits were only "occasional."
23  (*See* AR 23 (citing AR 104-15).)  Although these statements support the
    ALJ to a degree, it is unclear whether they purport to describe
24  Plaintiff's ability to concentrate *with or without distractions*.  As
    Dr. Muir noted, this distinction is critical to an understanding of
25  Plaintiff's cognitive ability.  (*See* AR 361 (noting that Plaintiff's
26  concentration was "average" on tests which approximated "a quiet room
    with no distractions," but "impaired" on those tests "which best
27  represent a real-life work situation, in which information is
    presented with distracting stimuli").  Given that Plaintiff's ability
28  to concentrate at home does *not* approximate a "real-life work

1   indicate, however, the reasons the ALJ offered were suspect at best,

2   and illegitimate at worst.  *See Lester*, 81 F.3d at 830-31.

3        But even if these had been sufficiently "specific and legitimate"

4   justifications for rejecting Dr. Muir's ultimate conclusion, the ALJ

5   did not purport to rely on them to reject anything other than Dr.

6   Muir's ultimate "conclusion."  (AR 23.)  Although specific, legitimate

7   reasons could have justified rejecting that *conclusion*,[7] the ALJ must

8   re-weigh Dr. Muir's opinion on remand because the decision does not

9   explain what weight, if any, she afforded the remainder of Dr. Muir's

10  six-page opinion, *apart from its* "conclusion." (*See* AR 23.)  This

11  matters because Dr. Muir's opinion was broader than just the

12  "conclusion" that Plaintiff cannot work; it assessed a critical work-

13  related limitation--specifically, the need to be free from

14  distractions--based on the results of cognitive tests. (*See* AR 361.)

15  Where, as here, an examining physician's opinion rests on independent

16  objective tests and clinical findings, the opinion itself may be

17  substantial evidence.  *See Andrews*, 53 F.3d at 1041.  The ALJ's

18  rejection of Dr. Muir's ultimate "conclusion," without more, simply

19  does not account for the fact that this examining physician's opinion

20  was the only one in the medical record containing findings about

21  Plaintiff's cognitive abilities based on objective tests.

22

23  _____

24  situation," this justification for rejecting Dr. Muir's conclusion is
    not legitimate insofar as it is not supported by substantial evidence

25  of record.

26      [7]  The ultimate issue of disability is a legal determination
    reserved to the Commissioner; thus, Dr. Muir's "conclusion" could have

27  been rejected on that point for specific, legitimate reasons supported
    by substantial evidence of record.  *See Nguyen*, 100 F.3d at 1466; *see*

28  *also Magallanes*, 881 F.2d at 751-752.

1   What makes the ALJ's perfunctory treatment of Dr. Muir's opinion
2   more problematic for the Court is that the ALJ purported to accept Dr.
3   Giang's opinion: which opinion, in turn, explicitly deferred to the
4   findings of Dr. Muir.[8]  (*See* AR 23-24; *see also* AR 341, 344, 348.)  If
5   Dr. Giang considered Dr. Muir's analysis to be sufficiently reliable
6   to incorporate it into his own assessment of Plaintiff's functional
7   limitations, as he evidently did, then it is unclear how the ALJ could
8   possibly purport to accept Dr. Giang's opinion *without also* accepting
9   the findings of Dr. Muir.  Yet the ALJ did not even acknowledge that a
10  medical opinion she accepted was based in part upon a medical opinion
11  that she rejected.  (*See* AR 23-24.)

12      On remand, therefore, the ALJ must re-examine the medical opinion
13  offered by Dr. Muir.  If she still intends to reject that opinion, she
14  must not only offer specific, legitimate reasons for rejecting its
15  ultimate *conclusions*, but must also offer clear and convincing reasons
16  for rejecting its *finding* that Plaintiff requires a working
17  environment free of distractions: a finding that is uncontradicted in
18  the medical record before the Court.

19
20
21
22
─────────────────

23      [8]  It is worth noting that Dr. Muir's opinion was procured to
    help Dr. Giang: who evidently felt that he did not have sufficient
24  information to opine about Plaintiff's cognitive limitations.  (*See* AR
    348.)  Once Dr. Muir submitted his findings and conclusions, Dr. Giang
25  accepted and relied upon those findings to fill in the gaps of his own
    understanding of Plaintiff's limitations.  (*See* AR 341, 344.)  This is
26  precisely what the Agency was supposed to have done.  *See* 20 C.F.R.
    § 404.1519a(a)(2) (noting that the Agency "will use the report from
27  the consultative examination to try to resolve a conflict or ambiguity
    if one exists").
28

23

1  C.    The Hypothetical Question The ALJ Posed To The Vocational Expert
2        Was Incomplete

3        The ALJ purported to accept the functional limitations adopted by
4  Dr. Giang.  (*See* AR 23-24.)  Plaintiff contends that the ALJ did not
5  incorporate all of the limitations found by Dr. Giang into the
6  hypothetical question he posed to the vocational expert.  (*See* Joint
7  Stip. at 3-4.)  After reviewing the record, the Court agrees that the
8  hypothetical question the ALJ posed to the vocational expert did not
9  set forth all of Plaintiff's limitations.

10       An ALJ's "[h]ypothetical questions posed to the vocational expert
11 must set out *all* the limitations and restrictions of the particular
12 claimant . . . ."  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)
13 (emphasis in original); *see also Thomas*, 278 F.3d at 956 (cautioning
14 that, "[i]n order for the testimony of a [vocational] [expert] to be
15 considered reliable, the hypothetical posed must include all of the
16 claimant's functional limitations, both physical and mental[,]
17 supported by the record")(citation and internal quotation marks
18 omitted).  If the hypothetical question posed to the vocational expert
19 does not set forth all of the claimant's limitations, it will not
20 constitute substantial evidence sufficient to carry the Agency's
21 burden at step five.  *See Andrews*, 53 F.3d at 1043 (noting that the
22 Agency can carry its step-five burden of proving the claimant can do
23 other jobs in the national economy through the testimony of a
24 vocational expert in response to a hypothetical that set out all of
25 the claimant's vocational limitations and restrictions).

26       Here, and as explained above, the ALJ purported to adopt the
27 functional limitations as found by Dr. Giang.  The ALJ summarized
28 those limitations as follows:

                                   24

1    [Plaintiff] has complaints of fatigue, balance problems,
2    poor coordination, intermittent unstable walking and
3    weakness, numbness, difficulty remembering and solving
4    problems, problems with attention, double or blurred vision,
5    sensory disturbances, bowel problems and sensitivity to
6    heat, vertigo, and poor cognitive function subject to
7    exacerbation and remission resulting in the following
8    restrictions: [Plaintiff] frequently suffers from
9    interference with attention and concentration.  She is
10   capable of low stress work.  Stress exacerbates or adds to
11   symptoms.  She can sit for 8 hours, stand/walk for 4 hours,
12   but medically she cannot sit continuously and must get up
13   and move around every hour for 5 minutes, and she should not
14   walk continuously.  [Plaintiff] can lift and carry 50 pounds
15   occasionally and 20 pounds frequently.  She suffers from bad
16   days about once a month, and must avoid extremes of
17   temperature and humidity, and heights.

18   (AR 23-24.)  These limitations formed the basis of the hypothetical
19   question that the ALJ posed to the expert via a series of
20   interrogatories.  (*See* AR 24, 386-89.)

21        1.   The Hypothetical Question Was Defective In That It Omitted
22             Any Mention Of Plaintiff's Need To Miss Work One Day Per
23             Month

24        Plaintiff argues that the hypothetical question was fatally
25   incomplete in that it omitted any mention of Dr. Giang's opinion that
26   Plaintiff would be required to miss work one day per month.  (*See*
27   Joint Stip. at 4.)  A review of the record confirms that the ALJ did
28   omit this limitation from the question that she posed to the

                                   25

1    vocational expert, only instructing the expert to assume that the

2    hypothetical person "suffers bad days about once a month." (*See* AR

3    387.)  The Court concludes that this was error.

4         Although the ALJ need not include all claimed impairments in his

5    hypothetical questions, she must make specific findings explaining her

6    rationale for disbelieving any of the claimant's subjective complaints

7    not included in the hypothetical. *See Copeland v. Bowen*, 861 F.2d

8    536, 540 (9th Cir. 1988).  Thus, an ALJ's failure to consider how

9    often a claimant's impairments will require her to miss work is error.

10   *See Walker v. Barnhart*, No. Civ.A. 04-11752-DPW, 2005 WL 2323169, at

11   *18 (D. Mass. Aug. 23, 2005)(holding that "[t]he ALJ erred by failing

12   to consider--by either accepting or explicitly discrediting--the

13   record evidence from [the claimant] and her treating physician

14   regarding how frequently she could be expected to miss work").

15        In Plaintiff's case, the ALJ clearly erred.  Although the ALJ

16   rejected some of Plaintiff's claimed limitations in her credibility

17   discussion, Plaintiff's need to miss one day of work per month was not

18   among the limitations that the ALJ rejected.  (*See* AR 22.)  That being

19   so, the ALJ could not simply ignore this portion of Dr. Giang's

20   opinion. *See Lester*, 81 F.3d at 830-31.  Errors of this nature

21   require remand, if they are not harmless.  *See Smith v. Barnhart,* No.

22   04-2197-GTV, 2005 WL 589758, at *9 (E.D. Pa. Mar. 11, 2005)(remanding

23   where the ALJ omitted the claimant's asserted need to miss work

24   periodically for doctor's visits in her hypothetical questions to the

25   vocational expert, "without specifically explaining in her credibility

26   analysis why she disbelieved that Plaintiff had those limitations").

27        The Court cannot say that this omission was harmless in the

28   circumstances of this case.  *See Batson*, 359 F.3d at 1197.  Indeed,

when Plaintiff's counsel asked the vocational expert to assume a
person who would miss one day of work per month, Ms. Winn-Boaitey
concluded that this hypothetical person was totally disabled,
specifically citing this limitation as part of the reason for that
conclusion.  (*See* AR 393.)  Because the ALJ relied solely on the
vocational expert's response to her hypothetical question for her
step-five conclusion that Plaintiff could perform other work, the
decision is not supported by substantial evidence.  *See Gallant v.
Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984)(noting that, if the ALJ's
hypothetical question to the vocational expert fails to reflect each
of the claimant's limitations supported by "substantial evidence," the
expert's answer has no evidentiary value).

Accordingly, on remand the ALJ must re-submit hypothetical
questions to the vocational expert.  At a minimum, and as explained
below, the ALJ's new hypothetical questions must contain the one-day-
per-month absenteeism limitation as found by Dr. Giang, unless the ALJ
offers specific, legitimate reasons for rejecting that limitation.
*See Lester*, 81 F.3d at 830-31.

2.   On Remand, Plaintiff May Develop The Record As To What Dr.
     Giang Meant By His Opinion That She "Frequently" Would
     Suffer Attention And Concentration Deficits

Plaintiff also laments that, although the ALJ accurately stated
Dr. Giang's conclusion that she would sustain "frequent" attention and
concentration deficits at work, she did not "attempt to interpret that
finding for the benefit of the vocational expert."  (Joint Stip. at
4.)  The Court concludes that, unless post-remand evidentiary
development shows that Dr. Giang accepts Plaintiff's definition of the

1  term "frequently" or adopts some definition of the term, the ALJ need
2  not define that term in her hypothetical questions to the vocational
3  expert.

4      A claimant's residual functional capacity is comprised of all of
5  the limitations for which there is substantial evidentiary support.
6  *See Rollins*, 261 F.3d at 857.   Where a medical source opines that a
7  claimant has a limitation but uses vague or undefined terms to
8  describe the functional effect of that limitation, the ALJ is
9  permitted to indulge in a reasonable construction of the term in his
10  questions to the vocational expert.   *See Crooker v. Apfel*, 114
11  F.Supp.2d 1251, 1258 (S.D. Ala. 2000)(holding that, where the doctor
12  "did not define 'frequent rests,' the issue before the court was
13  "whether the ALJ reasonably construed the term and properly accounted
14  for 'frequent rests,' as construed, in his hypothetical questioning").

15      In Plaintiff's case, and as the Agency points out, Dr. Giang was
16  completing a check-the-box form *given to him by Plaintiff's counsel*
17  when he adopted the term "frequently" to describe her attention and
18  concentration deficits.   (*See* Joint Stip. at 8.)   Plaintiff's counsel
19  later would define "frequently" as "unable to employ *any* attention or
20  concentration more than 1/3 of the time and up to 2/3 of the time over
21  the course of an eight hour workday" in the hypothetical they posed to
22  the vocational expert.   (*See* AR 392 (emphasis in original).)   Although
23  Plaintiff now urges the Court to find that the ALJ was required to
24  adopt that same definition, (*see* AR 4-5), the Court disagrees.   The
25  record lacks *any* evidence that Dr. Giang could have known that--by the
26  mere act of circling the word "frequently"--he was adopting the
27  definition of that term as defined by the *Dictionary of Occupational
28  Titles* ("DOT").   In these circumstances, the ALJ's decision to leave

that term undefined for the vocational expert was reasonable,
particularly given that the expert did not indicate that the undefined
term was vague.  (*See* AR 387-88.)

In light of the foregoing, the Court would not reverse if this
were the only alleged defect in the hypothetical question the ALJ
posed to the vocational expert.  But because the ALJ's error in
omitting the "one-day-per-month" absentee feature from her
hypothetical questions will require the vocational expert to be re-
questioned, and because the term "frequently" is not as helpful as it
would be if it were defined, the Court concludes that additional
evidentiary development of this area may be undertaken at Plaintiff's
election.  Specifically, the Court concludes that Plaintiff may re-
contact Dr. Giang, propose the DOT definition of "frequently" that she
offered in her hypothetical question to Ms. Winn-Boaitey, and
determine whether this doctor's opinion that Plaintiff's attention and
concentration defects would remain the same under that definition of
the term; if not, Dr. Giang should be asked to quantify what he meant
by "frequently."  The ALJ should then use whatever definition Dr.
Giang adopts (if any) in formulating the hypothetical question that he
poses to the vocational expert on remand.  Whether or not Plaintiff
chooses to seek this additional evidence from Dr. Giang, the ALJ must
ask the vocational expert to assume that the hypothetical claimant
would miss one day of work per month--in addition to all of the
limitations she posed to the expert on the first time around--unless
the ALJ offers specific, legitimate reasons for rejecting that
limitation.  *See Lester*, 81 F.3d at 830-31.

1    D.   Remand Is Appropriate

2         The determination whether to remand for further proceedings or

3    for payment of benefits lies within the discretion of the Court.

4    *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).   In most

5    circumstances in Social Security disability cases, remand is

6    appropriate.   *See Moisa v. Barnhart*, 367 F.3d 882, 886-87 (9th Cir.

7    2004).   Remand may be productive where additional proceedings can

8    remedy defects in the original administrative proceedings.   *See Celaya*

9    *v. Halter*, 332 F.3d 1177, 1184 (9th Cir. 2003).

10        In this case, as explained above, the ALJ erred by rejecting Dr.

11   Muir's "conclusions," without explaining what weight, if any, she gave

12   his specific finding that Plaintiff's attention and concentration

13   would be "impaired" in conditions approximating a "real-life" work

14   situation.   (*See* AR 361.)   In addition, the ALJ's understanding of Dr.

15   Giang's opinion--which she purported to adopt--was flawed because it

16   failed to account for that doctor's finding that Plaintiff would need

17   to miss one day of work per month.   These errors snowballed when the

18   ALJ omitted either of these limitations in the hypothetical questions

19   she propounded to the vocational expert.   Because the ALJ relied upon

20   the vocational expert's testimony for her step-five finding that

21   Plaintiff was not disabled, the errors cannot have been harmless.   *See*

22   *Batson*, 359 F.3d at 1197.

23        Because of these errors, and because the ALJ's hypothetical

24   questions to the vocational expert were both imprecise and under-

25   inclusive of Plaintiff's non-exertional limitations, the Court is not

26   in a position to say with certainty whether the medical and other

27   evidence of record compels the conclusion that Plaintiff is totally

28   disabled from any work.   *See DeLorme v. Sullivan*, 924 F.2d 841, 850

(9th Cir. 1990)("If the hypothetical does not reflect all the claimant's limitations, ... the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy."); *see also Bunnell v. Barnhart*, 336 F.3d 1112, 1116 (9th Cir. 2003)("[I]n cases where the vocational expert has failed to address a claimant's limitations ... we consistently have remanded for further proceedings rather than payment of benefits.")(citation and internal quotation marks omitted).  Thus, remand for an award of benefits is not justified.  *See Harman v. Apfel*, 203 F.3d 1151, 1158 (9th Cir. 2000).  Remand is necessary, however, to enable the ALJ to render a new decision.

On remand, the ALJ must do several things.  First, she must attempt to update the medical record.  At a minimum, this will entail obtaining the most recent records of Plaintiff's activities, condition, and medical treatment.  In addition, Plaintiff *may* seek additional information from Dr. Giang about his understanding of the term "frequently" as he used it to describe Plaintiff's concentration and attention deficits.  (*See* AR 343.)  Second, and on the basis of all of the evidence of record, the ALJ must re-assess Plaintiff's residual functional capacity in light of her exertional and non-exertional limitations.  In addition to assimilating any new evidence of record, the ALJ must either credit Dr. Giang's opinion that Plaintiff would need to miss one day of work per month, or provide specific, legitimate reasons why she rejects that limitation; the ALJ also must offer clear and convincing reasons if she decides to reject Dr. Muir's uncontroverted finding that Plaintiff's attention and concentration would be "impaired" in a work-like setting.  *See Lester*, 81 F.3d at 830-31.  Third, the ALJ must submit a new set of

1   hypothetical questions to the vocational expert.  Besides

2   incorporating all of the other limitations supported by the record,

3   these questions must ask the expert to assume a person who would miss

4   one day per month, if the ALJ has not rejected that limitation.  In

5   addition, if Plaintiff produces evidence that Dr. Giang has adopted a

6   particular definition of "frequently," the ALJ must include that

7   definition in his questions to the expert.  Also, unless the ALJ

8   rejects Dr. Muir's opinion that Plaintiff would have "impaired"

9   concentration in a work-like setting or finds that this limitation is

10  adequately covered by Dr. Giang's opinion of "frequent" attention and

11  concentration deficits, he must include that limitation in his

12  hypothetical questions to the vocational expert.  Finally, the ALJ

13  must render a new decision.

14                              IV.

15                          CONCLUSION

16      For all the foregoing reasons, the Agency's decision is REVERSED

17  and the case is REMANDED for further proceedings consistent with this

18  Memorandum Opinion and Order.

19      IT IS SO ORDERED.

20      DATED:    April  4  , 2006.

21

22                      _____/s/_____
                        PATRICK J. WALSH
23                      UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28  S:\PJW\Cases-Soc Sec\MORAN, S 131\Memo Opinion.wpd

                              32